IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHERYL BATES, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CV3118 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM AND ORDER ON |
| Social Security Administration, | ) | REVIEW OF THE FINAL DECISION OF |
| | ) | THE COMMISSIONER OF THE SOCIAL |
| Defendant. | ) | SECURITY ADMINISTRATION |
| | ) | |

Now before me is Plaintiff Cheryl Bates' complaint, filing 1, which is brought pursuant to 42 U.S.C. § 1383(c)(3). The plaintiff seeks a review of the Commissioner of the Social Security Administration's decision to deny the plaintiff's application Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq.[1] The defendant has filed an answer to the complaint and a transcript of the administrative record. (See filings 16, 19.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., filing 25; Def.'s Br., filing 30.) I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.

## I.   BACKGROUND

It appears that the plaintiff protectively filed an application for SSI benefits on October 18, 2004. (See Transcript of Social Security Proceedings (hereinafter "Tr.") at 29, 52, 111-13.) After the application was denied on initial review, (see id. at 52, 81-83), and on reconsideration,

---

[1]The complaint alleges that this is also "an action under Title II of the Social Security Act," (see Compl., filing 1, ¶ 3), but the decision under review does not appear to be based on an application for disability insurance benefits under Title II. Although the distinction between Title II and Title XVI applications is not significant for the purposes of my review, see House v. Astrue, 500 F.3d 741, 742 n.2 (8th Cir. 2007) ("The same analysis determines disability under Title II and Title XVI."), I will analyze this case as if it were based solely on a Title XVI application.

1

(see id. at 53, 75-78), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (id. at 51).  This hearing was held on November 13, 2006, (see id. at 792, 794), and, in a decision dated August 3, 2007, the ALJ concluded that the plaintiff was not entitled to SSI benefits, (see id. at 16-29).  In reaching this conclusion, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since October 18, 2004, the application date (20 CFR 416.920(b) and 416.971 et seq.).

2.      The claimant has the following severe combination of impairments: disorders of the back, urinary problems, visceral problems, pancreatitis, depression, obsessive compulsive disorder, anxiety and panic disorder, fracture of the left foot, post traumatic stress disorder, and left hand carpal tunnel syndrome and release (20 CFR 416.920(c)).  . . .

3.      From November 19, 2004 through April 17, 2005, the claimant's impairments, including the substance use disorder(s), meet section 12.09 through section 12.06 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)). . . .

4.      If the claimant stopped the substance use prior to April 18, 2005 and from April 18, 2005 through the present, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments. . . . .

5.      If the claimant stopped the substance use prior to April 18, 2005 and from April 18, 2005 through the present, the claimant would not and does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)). . . . .

6.      If the claimant stopped the substance use prior to April 18, 2005 and from this date through the present, the claimant would have the residual functional capacity to perform a full range of sedentary work during the entire period under consideration.  She can stand or walk 30 minutes at a time.  She cannot push or pull levers repetitively with either the upper or lower extremities on either side.  The claimant's ability to bend, twist turn [sic] is limited to no more than a frequent basis.  She can crawl, squat, climb, or kneel occasionally.  The claimant can handle, finger, and feel, but cannot use her hands for fine manipulation like eyeglass repair.  She

2

should avoid the use of air or vibrating tools or the use of motor vehicles.
The claimant cannot work at unprotected heights.  The claimant's ability
to understand, remember, and carry out short instructions is slightly
limited, but is moderately limited when dealing with detailed instructions.
The claimant's ability to make judgments on simple work related
restrictions is slightly limited.  The claimant's ability to interact with the
public, co-workers, and supervisors is moderately limited.  The claimant's
ability to respond to work pressures and changes in the work setting is
moderately. [sic]
. . . .

7.     The claimant has no past relevant work (20 CFR 416.965).

8.     The claimant was . . . about 41 years old, which is defined as a younger
       individual age 18-44, on the date the application was filed (20 CFR
       416.963).

9.     The claimant has a limited education and is able to communicate in
       English (20 CFR 416.964).

10.    Transferability of job skills is not an issue because the claimant does not
       have past relevant work (20 CFR 416.968).

11.    If the claimant stopped the substance use prior to April 18, 2005 and from
       April 18, 2005 through the present, considering the claimant's age,
       education, work experience, and residual functional capacity, there would
       be a significant number of jobs in the national economy that the claimant
       could perform (20 CFR 416.960(c) and 416.966).
       . . . .

12.    Because the claimant would not be disabled if she stopped the substance
       use (20 CFR 416.920(g)), the claimant's substance use disorder(s) is a
       contributing factor material to the determination of disability prior to April
       18, 2005 (20 CFR 416.935).

13.    The claimant has not been disabled within the meaning of the Social
       Security Act at any time from the date the application was filed through
       the date of this decision.

(Tr. at 18-21, 27-28.)

       The plaintiff requested that the Appeals Council of the Social Security Administration

review the ALJ's decision.  (See Tr. at 11-12.)  This request was denied, (see id. at 5-7), and

3

therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On June 3, 2008, the plaintiff filed the instant action.  (See Compl., filing 1.)  The plaintiff asks that the Commissioner's decision "be reversed and the Plaintiff be awarded Supplemental Security Income upon her original application."  (See id. at 2.)

## II.    STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The decision should not be reversed "merely because substantial evidence would have supported an opposite conclusion."  Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995) (citation omitted).  However, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984).  See also Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) ("To determine whether existing evidence is substantial, 'we must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it.'" (quoting Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993))).

I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision.  See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983). No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled.  See 20 C.F.R. § 416.920(a).  The ALJ continues the analysis

4

until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See id. Step one requires the ALJ to determine whether the claimant is currently engaged in any substantial gainful activity. See 20 C.F.R. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See id. Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 416.920(c). A "severe impairment" is an impairment (or a combination of impairments) that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 416.920(a)(4)(ii), (c); id. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that she is not disabled. See 20 C.F.R. § 416.920(a)(4)(ii), (c). Step three requires the ALJ to compare the claimant's impairment or combination of impairments to a list of impairments. See 20 C.F.R. § 416.920(a)(4)(iii), (d). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See id. If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 416.920(a). Step four requires the ALJ to consider the claimant's residual functional capacity[2] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 416.920(a)(4)(iv), (f). Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work

---

[2]"'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See id.

"In order to qualify for disability benefits, a claimant bears the burden of proving that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death."  Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  However, at step five of the sequential analysis described above, the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity to do "some job that exists in the national economy."  Id.  See also Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008).

In this case, the ALJ reached step five of the sequential analysis and concluded that the plaintiff was not disabled.  (See Tr. at 27-28.)

### III.   SUMMARY OF THE RECORD

At the time of the hearing before the ALJ, the plaintiff was "approximately 43 years of age and [had] a limited seventh-grade education."  (Tr. at 21.)  The parties emphasize the following aspects of the plaintiff's medical history.  (See Pl.'s Br., filing 25, at 3-10;[3] Def.'s Br., filing 30, at 2-4.)

On August 14, 2000, the plaintiff appeared at the Bryan LGH emergency room with complaints of nausea and frequent vomiting.  (See Tr. at 643.)  She also reported that "slight discomfort in the right upper quadrant" was present "at times."  (Id.)  She added that she had been drinking "3 coffees a day, 2 liters of pop, and . . . at least . . . a six-pack of beer a day."  (Id.)  After the plaintiff received one liter of normal saline, she reported that her nausea had been resolved.  (Id. at 644.)  A radiology report indicated mild enlargement of the liver "with increased echogenicity suggesting fatty infiltration or potentially hepatocellular disease."  (Id. at 645.)  She was diagnosed with "[p]robable alcoholic gastritis" and instructed to reduce her smoking, reduce

---

[3]The plaintiff numbered the pages of her brief such that the page labeled "1" is actually the fifth page of the brief.  My page number citations refer to the "actual" page number (which appears in the CM/ECF system header) rather than the page number assigned by the plaintiff.

her consumption of alcohol, coffee, and pop, and follow up with a doctor.  (Id. at 644.)

On December 9, 2001, the plaintiff returned to the Bryan LGH emergency room "with complaints of right upper quadrant abdominal pain for a year."  (Tr. at 609.)  She reported that she had been "drinking upwards of a 12-pack of beer per day," but had "cut back over the last couple of weeks to 3-4 beers per day."  (Id.)  In addition to the pain, she reported some nausea and "vomiting about two times weekly."  (Id.)  The plaintiff's liver was found to be "enlarged again," and she was diagnosed with "[a]bdominal pain . . . probably secondary to alcoholic hepatitis and hepatitis C."  (Id. at 610.)

The plaintiff visited the emergency room at St. Elizabeth Regional Medical Center on January 4, 2002, with complaints of "persistent mid epigastric abdominal discomfort for the past year," "[w]orse since alcohol last night."  (Tr. at 489.)  The plaintiff was diagnosed with "[a]bdominal pain, suspect alcoholic gastritis," "[a]lcoholic liver disease," and "Hepatitis C," and she was told that her lifestyle "needs to be changed if she is ever going to have resolution of pain."  (Id. at 490.)  She was treated with a "cocktail" of IV fluids and medication, and she was discharged in good condition.  (See id.)

On May 17, 2002, the plaintiff appeared at the St. Francis Medical Center in Grand Island, Nebraska, complaining of weakness.  (Tr. at 422.)  She noted that her weakness and "right upper quadrant pain have been progressively worsening over a two month period."  (Id.)  The plaintiff was diagnosed with "chronic hepatitis C," referred to a Dr. Fruehling "for ongoing management," and discharged in stable condition.  (Id. at 423.)

On May 21, 2002, the plaintiff visited Family Practice of Grand Island, P.C., and complained of fatigue, nasal congestion, and knee pain.  (Tr. at 215.)  Both the fatigue and the knee pain were reported as "longstanding," and it was noted that the fatigue had been attributed to the plaintiff's chronic hepatitis C.  (Id.)  She was assessed with "chronic Hepatitis C," "[h]istory of Chondromalacia patella,"[4] "symptoms of nasal congestion," and "fatigue, probably secondary to above factors."  (Id.)  The plaintiff received medication for her nasal congestion, and she was instructed to perform "straight leg raise exercises for her knees."  (Id. at 216.)

---

[4]Chondromalacia patellae is "a softening of the articular cartilage of the patella." Stedman's Medical Dictionary 369 (28th ed. 2006).

The plaintiff returned to the St. Francis emergency room on June 10, 2002, complaining that she "[v]omited." (Tr. at 407.)  She was diagnosed with chronic, diffuse abdominal pain and a "[u]rinary tract infection with slight evidence of possible pyelonephritis." (Id. at 408.)[5]  She was instructed to "[c]ontinue meds as directed" and "[s]ee primary doctor in two to three days for recheck." (Id.)

On June 12, 2003, the plaintiff again appeared at St. Francis for a "follow-up." (Tr. at 383.)  Records state that the plaintiff "continues to have a complaint of fatigue and otherwise she feels bloated every once in a while." (Id.)  She returned on June 30, 2003, with complaints of "nausea and vomiting over the weekend." (Id. at 364.)  The plaintiff was assessed with "Hepatitis C with increased liver enzymes" and "[v]omiting and nausea episodes with left sided flank pain." (Id.)  The plaintiff was directed to drink fluids for rehydration, continue taking medicine for reflux disease, and return in ten days for a "close follow-up." (Id.)

On August 28, 2003, the plaintiff returned to St. Francis with complaints of right flank pain with nausea and vomiting. (Tr. at 361.)  The physician's notes state, "The patient always denied drinking alcohol, but her appearance suggest[s] that she does and I did confront her with that and she admitted that she had been drinking on and off." (Id.)  The plaintiff was also described as being "in distress with crying and tears." (Id.)  She was assessed with "[n]ausea and vomiting and abdominal pain"; "[a]nxiety with adjustment and depressed moods" to be treated by a continuation of the plaintiff's Paxil regimen; "[q]uestionable alcohol abuse"; urinary tract infection; and hepatitis C. (Id. at 361-62.)  The physician noted, however, that "[w]e do not have a real diagnosis beside hepatitis C." (Id. at 362.)

On March 25, 2004, the plaintiff was admitted to St. Francis for "acute alcohol detox." (Tr. at 220.)  She left St. Francis on March 27, against medical advice, with the following diagnoses: "Acute alcohol intoxication, alcohol dependency, alcoholic hepatitis, thrombocytopenia, anemia, dyspepsia with presumed gastritis, hepatitis C, antisocial personality trait, substance abuse mood disorder with depression and anxiety, history of migrane headache

---

[5]Pyelonephritis is "[i]nflamation of the renal parenchyma, calyces, and pelvis, particularly due to local bacterial infection." Stedman's Medical Dictionary 1608 (28th ed. 2006).

and a dermoid cyst." (Id.)[6]

The plaintiff returned to the St. Francis emergency room on April 21, 2004, complaining of "[i]tching arms." (Tr. at 324.) A physician noted, however, that "obviously she is intoxicated." (Id.) He also noted that the plaintiff was "well known" to him, and that "[t]oday she has a lot of the same problems but they are all related to her alcoholism." (Id.) His diagnoses were alcoholism, liver enlargement, and "nonspecific skin dermatitis, factitious."[7] (Id. at 325.) The plaintiff was discharged in fair condition, and medications were ordered. (Id.) The physician commented, however, that the plaintiff "has pretty much failed everything as far as treatments," and that treatment for alcohol abuse "is what needs to be accomplished here." (Id.)

On June 13, 2004, the plaintiff appeared at the St. Elizabeth emergency room and complained that her left foot, which had been fractured on June 2, had become swollen and red. (Tr. at 484.) Although an orthopedist had placed her in a walking boot, the plaintiff reported that she took the boot off because it was "uncomfortable," and she "has just basically been walking on the foot since then." (Id.) She also complained of a twisted right ankle, low back pain, and "dark malodorous urine" for the past week, and she noted that it is "normal for her" to vomit once or twice daily. (Id.) The patient was diagnosed with a "[f]ractured left fifth metatarsal," "[r]ight ankle sprain," and "dysuria," and she was discharged in stable condition with an orthopedic shoe, crutches, and directions to follow up with an orthopedist and increase her fluid intake. (Id. at 485.)

In a letter dated August 16, 2004, Dr. David Lofgren stated that he "just met [the plaintiff], who was here to get some information regarding disability." (Tr. at 426.) He then "summarize[d] her current disabilities" as follows:

1.      She is suffering from severe depression and has been off her Paxil CR because she could not afford it, she says she does better with that. She has a long history of depression, more of a chronic situation.

2.      Chronic hepatitis C, active hepatitis. She has been advised to have

---

[6]Thrombocytopenia is "[a] condition in which an abnormally small number of platelets is present in the circulating blood." Stedman's Medical Dictionary 1984 (28th ed. 2006).

[7]Factitious means "[a]rtificial; self-induced; not naturally occurring." Stedman's Medical Dictionary 694 (28th ed. 2006).

interferon treatments after a biopsy, she needs to have that done.  She has
lab work already done indicating a significant hepatitis C.

3.      Low platelets.
4.      Elevated bleeding time because of liver disease.
5.      Low potassium.
6.      Jones fracture of her left fifth metatarsal.
7.      Chronic nausea.
8.      She has been advised to have a total hysterectomy for a dermatoid tumor.
9.      Nephrolithiasis bilaterally.

(Id.)[8]

The plaintiff was hospitalized at St. Elizabeth from September 14, 2004, through
September 23, 2004.  (Tr. at 430.)  Initially, she was admitted through the emergency room with
complaints of "right upper quadrant pain," diagnosed with pancreatitis, "and initiated on IV
fluids as well as thiamine and folate."  (Id.)  Later, "[s]he began to go into more significant
alcohol withdrawal . . . , manifested by more delirium and tremor."  (Id.)  After a psychiatric
evaluation, the plaintiff was diagnosed with alcohol dependence and dysthymia and given a
Global Assessment of Functioning score of 45.  (Id. at 436.)  Her final diagnoses were
"[p]ancreatitis secondary to alcoholism," "[c]hronic hepatitis C, per patient,"
[t]hrombocytopenia, believed to be secondary to bone marrow suppression from alcohol abuse,"
"[i]ncidental small 2-millimeter in the lower pole of the left kidney," "3.5 x 4.4-centimeter right
ovarian mass which appears to be a dermoid cyst," "[e]scherichia coli bacteremia, believed to be
secondary to urinary tract infection," and [s]taphylococcus aureus bacteremia, believed to be
contaminant."  (Id.)  She was discharged in "much improved" condition and was instructed to
follow-up with the county health department.  (Id. at 430-31.)

On October 3, 2004, the plaintiff was treated at the St. Elizabeth emergency room for
upper abdominal pain and vomiting after "drinking a 12 pack of beer."  (Tr. at 476.)  She was
diagnosed with gastritis, alcohol abuse, alcoholism, and "[h]istory of hepatitis C," and discharged
with recommendations to avoid alcohol and receive treatment for her alcohol use.  (Id. at 477.)

The plaintiff appeared at the Bryan LGH Medical Center-East in Lincoln on October 26,

---

[8]Nephrolithiasis refers to the "[p]resence of renal calculi," or "stones."  Stedman's
Medical Dictionary 1290 (28th ed. 2006).  See also id. at 289 (defining "calculi" and "calculus").

10

2004, with complaints of upper abdominal pain, chest pain, and vomiting.  (Tr. at 583.)  She stated that she had been "drinking alcohol intermittently" since her hospitalization earlier in the month because "she ran out of her medication and drinks instead to help control the pain."  (Id.)  She was discharged home with diagnoses of "[a]bdominal pain - non-surgical," chronic pancreatitis, hepatitis, and nausea.  (Id. at 593.)

A record from the People's Health Center, also dated October 26, 2004, indicates that the plaintiff was diagnosed with chronic depression, pancreatitis, chronic hepatitis, and alcohol abuse. (Tr. at 544.)  Additional records dated November 12, 2004, and December 21, 2004, indicate that the plaintiff reported pain, alcohol use, depression, and other ailments.  (See id. at 536-37, 540-41.)

On January 15, 2005, the plaintiff appeared at the St. Elizabeth emergency room and presented complaints of "right upper quadrant epigastric pain."  (Tr. at 470.)  She admitted that she consumed "about eight beers" that night.  (Id.)  She was diagnosed with "[e]xacerbation of crhinic pancreatitis, gastritis and alcohol abuse," and she was discharged with instructions to abstain from alcohol and follow up with a doctor in three days.  (Id. at 472.)

On January 26, 2005, Dr. Gail Ihle conducted a "Psychological Interview" with the plaintiff.  (Tr. at 458.)  Dr. Ihle diagnosed the plaintiff with posttraumatic stress disorder, "depressive disorder NOS with anxiety," and "alcohol dependence (by history)," along with pancreatitis, hepatitis C, and "chronic low platelet count."  (Id. at 460-61.)  He opined,

> Claimant's activities of daily living appear to be limited because she does not want to leave the house.
> Claimant stated that she stopped being social several years ago.
> There do not appear to be recurrent episodes of deteriorations.
> Claimant's ability to sustain concentration and attention needed for task completion seemed adequate.
> Claimant would be able to remember short and simple instructions.
> Claimant would be able to carry out short and simple instructions under ordinary supervision.
> Claimant would be able to relate appropriately to peers and supervisors on a superficial level.
> Adaptation to much change in her environment would be difficult for claimant.

11

(Id. at 460.)  Dr. Ihle stated that the plaintiff's prognosis was "fair," and that "[o]nce she has completed the [inpatient alcohol rehabilitation program] and stays with her [medication therapy and regular psychotherapy], she may be able to function reasonably well."  (Id. at 461.)

An "Initial Psychiatric Assessment" was made of the plaintiff at the Western Montana Mental Health Center on November 15, 2005.  (Tr. at 745.)  The plaintiff reported that she was struggling with depression and anger and was having difficulty sleeping.  (Id.)  She reported that medications did help level her emotions, but she admitted that "she has a long history of not being med compliant and not taking medications as prescribed."  (Id.)  She also reported that she had been "diagnosed with PTSD" as an adult after being sexually assaulted.  (Id.)  "She denie[d] any alcohol usage except for an occasional drink," with her last drink being on St. Patrick's Day."  (Id. at 746.)  The plaintiff appeared to be depressed and had difficulty focusing and concentrating.  (See id. at 746-47.)  She reported "difficulties with anxiety that can lead to panic attacks, racing thoughts, difficulty with sleep, feelings of helplessness, and increased depression."  (Id. at 747.)  The plaintiff was diagnosed with "Posttraumatic Stress Disorder, Chronic," and "History of ADHD, Chronic, Combined Type," and she was prescribed Seroquel to help her sleep.  (Id.)

As noted previously, a hearing was held before an ALJ on November 13, 2006.  (See Tr. at 794.)  The ALJ noted that the plaintiff had identified the following impairments as contributing to her alleged disability: "[b]ack pain, urinary problems, visual problems, pancreatitis, depression, obsessive compulsive disorder, anxiety or panic disorder, a fraction [sic] of the lower left . . . extremity . . . [a]nd post-traumatic stress disorder."  (Id. at 799.)  The plaintiff, though counsel, accepted this list as accurate and added "carpal tunnel of the left hand and including a surgery for relief of carpal tunnel, upper left extremity."  (Id.)  The plaintiff testified that she suffers from constant lower back pain that radiates down both legs, upper back pain near her shoulders, loss of bladder control two or three times per day, blurred vision in both eyes and watering in her left eye, pain and nausea due to pancreatitis (which forces her to lay down approximately six hours per day), nightmares, panic attacks, paranoia, and a fractured left foot that continues to cause pain and swelling.  (Id. at 801-08.)  She also testified that she often hears voices.  (Id. at 809.)  Under questioning from the ALJ, the plaintiff denied ever having

12

what she "would consider a problem" with alcohol, and she stated that she had not taken a drink of alcohol during the past year. (Id. at 811.) She also stated that her lack of finances and the lack of services in Ainsworth, Nebraska, prevented her from obtaining adequate treatment for her impairments. (Id. at 812.) She testified that she has "had carpal tunnel in both hands" and experiences "gripping problems." (Id. at 813.) She also testified that on an average day, her pain is a "ten" on a scale of one to ten, with "ten" representing "disabling pain." (Id. at 815.)

Dr. Thomas England, a medical expert, then testified. (See Tr. at 816.) Dr. England first verified that the plaintiff was not currently taking any medication and that her "last contact with any medical person" was on September 14, 2006. (Id. at 817.) He noted that the plaintiff's "mental health contacts . . . and the majority of the treatment contacts in the record would have been during the time that alcohol was used," and he opined that through April 2005, the plaintiff would not "meet or equal any listing absent substance abuse." (Id. at 828.) In response to questions from the plaintiff's counsel, Dr. England testified that there was no indication of "any problems with alcohol abuse" after April 2005. (Id. at 835.)

Also during the hearing of November 13, 2006, the ALJ asked Gail Leonhardt, a vocational expert (VE), to consider a hypothetical individual with the following limitations:

> This individual has a . . . vocational profile identical to the Claimant's. This individual has the ability to perform a full range of sedentary work. This individual's ability to stand and walk is limited to 30 minutes at any one time. This . . . individual cannot bend, push or pull levers repetitively with either her upper or lower extremities bilaterally. Bending, twisting and turning is limited to frequent. Crawling, stooping, squatting, kneeling and climbing are all limited to occasional. With regard to handling, fingering and feeling the limitation is that she cannot use her hands to handle, finger, or feel for those functional activities which require fine manipulation . . . . She cannot use air or vibrating tools. She cannot use motor vehicles. She cannot work at unprotected heights. . . .
>         . . . .
> This individual's ability to understand, remember, and carry out short, simple instructions are [sic] slightly limited. Understanding, remembering and carrying out detailed instructions are moderately limited. Making judgments on simple work related decisions are slightly limited. Interacting appropriately with the public, co-workers or supervisors is moderately limited. And responding to work pressures or changes in the usual work setting is moderately limited.

13

(Tr. at 842-44.)  After setting forth this "hypothetical," the ALJ stated, "Based solely on the over-arching RFC of sedentary, the court concludes she couldn't perform any of [the jobs listed on the VE's report]."  (Id. at 844; see also id. at 175.)  The ALJ then asked the VE, "Are there any other jobs in the national economy that she could perform?"  (Id.)  The VE responded affirmatively and testified that the individual described in the hypothetical could perform certain unskilled, sedentary jobs in the regional and national economies.  (Id. at 845-46.)  Before concluding the hearing, the ALJ ordered the plaintiff to "attend two consultive evaluations."  (Id. at 849.)

On April 18, 2007, Ruilin Wang, M.D., performed a "Disability Evaluation" of the plaintiff.  (Tr. at 772.)  During the course of his assessment, Dr. Wang noted that the plaintiff claimed to be "unable to see very well" through her left eye.  (Id. at 775.)  On a "Medical Source Statement" form, however, he checked a box indicating that the plaintiff's impairments did not affect her vision.  (Id. at 781.)   His examination revealed no palpable organomegaly.  (Id. at 776.)[9]  His diagnoses were as follows:

1. Chronic knee joints pain, possible arthritis.
2. Chronic lower back pain.
3. Anxiety disorder.
4. Depression.
5. Posttraumatic stress disorder.
6. History of migraine with frequent headaches.
7. Asthma.
8. Positive hepatitis C[.]
9. Stress incontinence.
10. Tobacco dependence.

(Id. at 776-77.)  Dr. Wang noted that the plaintiff claimed to have difficulty lifting anything heavier than five pounds due to "weakness on the lower extremities and the persistent lower back pain."  (Id. at 776.)  On the "Medical Source Statement" form referred to above, he indicated that the plaintiff could lift and carry up to ten pounds occasionally; could sit for one hour during an eight-hour work day; could stand for 20 minutes during an eight-hour work day; could walk for

_____

[9]Organomegaly refers to an abnormal enlargement of the organs of the digestive, respiratory, urogenital, or endocrine systems or the spleen, heart, or great vessels.  See Stedman's Medical Dictionary 1380, 2135, 2136 (28th ed. 2006).

14

15 minutes during an eight-hour work day; and would spend the balance of an eight-hour work day "resting as tolerated." (Id. at 778-79.)

On April 19, 2007, Cassie Leutzinger, Psy. D., performed a psychological evaluation of the plaintiff. (Tr. at 785.) Dr. Leutzinger noted that the plaintiff reported experiencing abuse and sexual trauma at various times from her youth through 1998. (Id. at 785-86.) The plaintiff also reported "symptoms of depression includ[ing] problems with sleep, poor eating habits, tearfulness, irritability, shortened attention span, and memory changes," along with "symptoms of PTSD including denial, nightmares, avoidance of situations that elicit memories of trauma, as well as experiencing emotions and anger when remembering her past." (Id. at 786.) In addition, she reported "experiencing chest pain, violent shaking, sweating, and fear of leaving her home." (Id.) She added that "her limitations . . . include hypervigilance, being afraid of people, . . . fear she will become outraged, needing things done a particular way, memory decline, being paranoid, not trusting people, and feeling safe only when in her home." (Id.) She "denied any substance use." (Id.) The "Minnesota Multiphasic Personality Inventory – II Edition (MMPI-2)" was administered to the plaintiff, and the plaintiff "responded to this instrument in a fashion indicating a severe level of distress and psychopathology." (Id. at 787.) Dr. Leutzinger noted, however, that the "[q]uality of this assessment appears invalid due to her responses elevating every scale [but one] into the clinically significant range," and that, "[d]ue to the numerous elevations, it is difficult to ascertain information beneficial in better understanding this claimant." (Id.) Dr. Leutzinger diagnosed the plaintiff as suffering from PTSD, "Major Depressive Disorder, recurrent, moderate, with atypical features," and "Panic Disorder with Agoraphobia." (Id.) She also noted that the plaintiff suffered from "marked" restrictions in her abilities to "[u]nderstand and remember simple instructions," "make judgments on simple work-related decisions," "[u]nderstand and remember complex instructions," "[c]arry out complex instructions," "make judgments on complex work-related decisions," and "[i]nteract appropriately with the public." (Id. at 789-90.) Further, she opined that the plaintiff suffered from "extreme" restrictions in her abilities to "[i]nteract appropriately with supervisor(s)," "[i]nteract appropriately with co-workers," and "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Id. at 790.)

15

# IV.   ANALYSIS

The plaintiff argues that the Commissioner's decision must be reduced for two main reasons: 1) the ALJ did not properly evaluate the plaintiff's "severe impairments" at step two of the sequential analysis, and 2) the ALJ erred by discounting certain medical records.  (See Pl.'s Br., filing 25, at 13, 17.)  I shall consider each of the plaintiff's arguments in turn.

## A.   Whether the ALJ Erred in His Analysis of the Plaintiff's "Severe Impairments"

The plaintiff argues first that the ALJ erred at step two of the five-step sequential analysis because he did not find that the plaintiff's hepatitis C or alcoholic hepatitis were "severe impairments."  I disagree.

It is the claimant's burden to establish that an impairment is "severe" within the meaning of the applicable regulations.  See Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Id.  In other words, "[i]f the impairment would have no more than a minimal affect on the claimant's ability to work, then it does not satisfy the requirement of step two."  Id.  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  Id. at 708 (citations omitted).

The plaintiff argues that a number of medical records support her claim that her hepatitis C constituted a severe impairment.  (See Pl.'s Br., filing 25, at 19.)  She states,

> In May 2002, Bates complained of abdominal pain and fatigue.  (R. 215.)  The examining doctor attributed the abdominal pain to hepatitis C.  (R. 215.)  The same doctor also indicated that Bates' fatigue was secondary to hepatitis C.  (R. 215.)  Later, in June 2003, Bates reported experiencing fatigue.  (R. 383.)  In a November 2005 psychiatric evaluation, Bates indicated that she felt no energy or motivation and stayed in bed.  (R. 745.)  In interrogatories prepared prior to [the] hearing, Bates asserted that abdominal pain affected her ability to bend, stoop, and kneel.  (R. 165.)  These limitations alone meet the low de minimis threshold set forth in the case law.

(Id. (citation omitted).)

In response, the defendant argues that the May 2002 and June 2003 records predate the plaintiff's alleged onset date of disability; that during the November 2005 psychiatric evaluation,

16

the plaintiff attributed her lack of energy and motivation to depression (as opposed to some form of hepatitis); that during the relevant time period, the plaintiff's hepatitis C was associated with her alcohol consumption; and that the ALJ properly accounted for the disabling effects of substance abuse in his analysis.  (See Def.'s Br., filing 30, at 7.)

After carefully considering the record, I find that the ALJ's decision not to identify hepatitis C and alcoholic hepatitis as "severe impairments" is supported by substantial evidence. The record does indicate that the plaintiff has been diagnosed with hepatitis C and alcoholic hepatitis, and these impairments have been associated with fatigue and abdominal pain. However, as the defendant correctly notes, the plaintiff has not referred me to any evidence that she suffered from hepatitis-related fatigue at any time after the alleged onset date.  Therefore, I am not convinced that plaintiff's hepatitis causes fatigue that would have more than a minimal effect on her ability to do basic work activities.  Also, I note that the ALJ's failure to list hepatitis C or alcoholic hepatitis as "severe impairments" did not cause him to disregard the plaintiff's complaints of abdominal pain.  Rather, the ALJ, and indeed the plaintiff herself, attributed the abdominal pain to pancreatitis—and pancreatitis was identified as a "severe impairment."  (See Tr. at 805-06 (setting forth the plaintiff's testimony regarding the pain that her pancreatitis causes in her "left upper portion" of her stomach).)  I am not persuaded that a remand is necessary under these circumstances.  See Zanor v. Astrue, No. 08-4584(DSD/FLN), 2009 WL 1133452, at *11 (D. Minn. Apr. 27, 2009) (holding that remand was not necessary where ALJ did not ignore claimant's symptoms of back and leg pain, but attributed the symptoms to a severe impairment other than the impairments alleged by the plaintiff on review).[10]

_____

[10]I note parenthetically that although an ALJ must "fairly and fully develop the record," he is under no obligation "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability."  Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008) (citations omitted); see also Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)).  In this case, the plaintiff did not initially present hepatitis C or alcoholic hepatitis as bases for her disability claim.  (See, e.g., Tr. at 137 (listing "Depression, OCD Anxiety, Chronic Pancreitis [sic]" as "the illnesses, injuries or conditions that limit [the plaintiff's] ability to work").)  Nor did she claim during the hearing before the ALJ that hepatitis C and/or alcoholic hepatitis contributed to her alleged disability.  (See Tr. at 799.)  Instead, as noted above, she claimed that she suffered from pancreatitis, and she attributed her abdominal pain to that impairment.  (See id. at 805-06.)

The plaintiff also argues that a remand is necessary because it is unclear whether the ALJ found "viceral problems" or "visual problems" to be a severe impairment at step two of his analysis.  On this point, I agree with the plaintiff.

During the hearing, the ALJ and the plaintiff's attorney listed the plaintiff's "alleged impairment[s]."  (See Tr. at 799.)  This list of impairments included "[b]ack pain, urinary problems, visual problems, pancreatitis, depression, obsessive compulsive disorder, anxiety or panic disorder, a [fracture] of the lower left . . . extremity[,] . . . post-traumatic stress disorder[,] . . . . [and] carpal tunnel of the left hand and including a surgery for relief of carpal tunnel, upper left extremity."  (Id. (emphasis added).)  The plaintiff was questioned about each of these impairments during the hearing.  (See id. at 801-10, 813-14.)

In his decision, the ALJ stated that the plaintiff "alleges being unable to perform her past work . . . or other work secondary to back pain, urinary problems, visual problems, pancreatitis, depression, obsessive-compulsive disorder, and anxiety."  (Id. at 21-22 (emphasis added).)  As I noted above, however, the ALJ made the following finding at step two of the sequential analysis:

> 2.    The claimant has the following severe combination of impairments:
> disorders of the back, urinary problems, visceral problems, pancreatitis,
> depression, obsessive compulsive disorder, anxiety and panic disorder,
> fracture of the left foot, post traumatic stress disorder, and left hand carpal
> tunnel syndrome and release.

(Id. at 18 (citation omitted) (emphasis added).)  The plaintiff argues that the ALJ's use of the term "visceral problems" in his step two findings creates confusion because it is unclear whether the ALJ meant to list "visual problems" as a severe impairment or whether he used the term "visceral" to refer to the abdominal pain associated with the plaintiff's hepatitis C, alcoholic hepatitis, or gastritis.  (See Pl.'s Br., filing 25, at 21.)  She adds that under the circumstances, the case must be remanded for clarification.  (See id.)  In response, the defendant argues that "[t]here is no discrepancy with regard to the ALJ's determination that Plaintiff had severe visceral problems," because "Plaintiff's testimony and the medical evidence of record contain numerous complaints of abdominal pain related to her consumption of alcohol."  (Def.'s Br.,

---

Given these facts, the ALJ did not err by failing to investigate hepatitis C or alcoholic hepatitis as alternate sources for the abdominal symptoms that were allegedly caused by her pancreatitis.

filing 30, at 10.)

The defendant's response assumes that the ALJ intended to use the term "visceral problems" in his step two findings. It seems to me, however, that the word "visceral" might well appear in the ALJ's findings as a result of a transcription or typographical error. Indeed, although it is plausible that the ALJ meant to use the term "visceral" in his decision, there is a substantial likelihood that the ALJ intended to use the word "visual" rather than "visceral."[11] Under the circumstances, and given the breadth of the term "visceral problems,"[12] I find that the case must be remanded for clarification. If the ALJ meant to find that the plaintiff suffers from "visceral problems," those "visceral problems" should be defined with greater specificity. If the ALJ meant to find that the plaintiff suffers from "visual problems," that finding should be explicit, and it should be apparent that the limiting effects of the plaintiff's "visual problems" (either alone or in combination with the plaintiff's other impairments) have been properly taken into account.

---

[11]Four general points support an inference that the word "visceral" is an erroneous transcription of the word "visual." First, the words "visual" and "visceral" are similar enough in both spelling and pronunciation that an erroneous transposition of the terms is quite plausible. Second, the plaintiff alleged that she suffered from "visual problems" and described those problems during her hearing testimony, and the body of the ALJ's decision refers to the plaintiff's allegations and testimony about "visual" and "vision" problems. (See Tr. at 22, 25-26, 799, 804-05.) Third, the ALJ correctly noted that the plaintiff attributed her abdominal pain to pancreatitis. (See id. at 26, 805-06.) It seems unlikely, therefore, that he would intentionally use the term "visceral problems" to account for the plaintiff's allegations of abdominal pain in his step two findings when his step two findings also include "pancreatitis." Finally, the impairments alleged by the plaintiff at the hearing and the impairments listed by the ALJ in his step two findings are parallel–except for the substitution of the term "visceral" for "visual." (Compare Tr. at 799 (listing: 1. back pain, 2. urinary problems, 3. visual problems, 4. pancreatitis, 5. depression, 6. obsessive compulsive disorder, 7. anxiety or panic disorder, 8. "a [fracture] of the lower left . . . extremity[,]" 9. post-traumatic stress disorder, and 10. "carpal tunnel of the left hand . . . .") with id. at 18 (listing: 1. disorders of the back, 2. urinary problems, 3. visceral problems, 4. pancreatitis, 5. depression, 6. obsessive compulsive disorder, 7. anxiety and panic disorder, 8. fracture of the left foot, 9. post traumatic stress disorder, and 10. "left hand carpal tunnel syndrome and release.").)

[12]My medical dictionary defines "viscera" as organs "of the digestive, respiratory, urogenital, and endocrine systems as well as the spleen, the heart, and great vessels." Stedman's Medical Dictionary 2136 (28th ed. 2006).

19

In summary, although the ALJ's failure to list hepatitis C and alcoholic hepatitis as severe impairments does not warrant remand, his use of the term "visceral problems" renders his findings ambiguous, and I must remand the case for clarification.

## B.   Whether the ALJ Erred by Discounting Certain Medical Records

The plaintiff argues next that the ALJ erred by disregarding Dr. Wang's report, Dr. Leutzinger's report, and the "Initial Psychiatric Assessment" made at the Western Montana Mental Health Center on November 15, 2005.  (See Pl.'s Br., filing 25, at 17.)  I shall consider the plaintiff's arguments concerning each of these three medical records in turn.

The ALJ's decision includes the following statements about Dr. Wang's report:

> In reviewing the report, the undersigned is impressed that Dr. Wang appears to have taken the claimant's statements at face value in stating that her problems affected her.  The undersigned finds that his functional limits are astonishingly low and are not worthy of much weight in light of the record as a whole or his own examination.  The claimant's clinical tests do not support Dr. Wang's opinion of the claimant's limitations.

(Tr. at 23 (citations omitted).)  Thus, it appears that the ALJ discounted Dr. Wang's report for two main reasons: 1) Dr. Wang's opinion was based more on the plaintiff's subjective complaints and less on the objective medical evidence, and 2) Dr. Wang's report is inconsistent with the record as a whole.

I find that the ALJ's decision to give reduced weight to Dr. Wang's report was not erroneous.  The Eighth Circuit instructs that an "ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).  Also, an ALJ is "entitled to give less weight to [a consulting physician's] opinion" when it is "based largely on [the claimant's] subjective complaints rather than on objective medical evidence."  Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).  The ALJ properly determined that Dr. Wang's opinions about the plaintiff's abilities to lift, carry, sit, stand, walk, use her hands, and perform "postural activities" were based not on the results of his physical examination of the plaintiff, but rather on the plaintiff's subjective complaints of pain and weakness.  (See Tr. at 772, 776, 778, 780-81.)  The ALJ also properly determined that the record as a whole lacked objective evidence consistent

20

with the severe physical limitations alleged by the plaintiff.[13]

> The ALJ decided to give "little weight" to Dr. Leutzinger's opinions for similar reasons. He stated,

> > Another Medical Source Statement was completed by consulting examiner, Cassie Leutzinger, PsyD, but it appears that this opinion also gave significant and excessive weight to the claimant['s] statements. The MMPI, for example, was considered invalid by the examiner because all of the scales were elevated by the claimant to the "clinically significant range." In completing this Medical Statement, Dr. Leutzinger did not discuss the claimant's alcohol history problems. The undersigned gives little weight to the consulting examiner's opinion concerning the claimant's functional abilities.

(Tr. at 23.) He added that he gave "weight to the opinion of Dr. Ihle," which he found to be "generally consistent with the residual functional capacity" of the plaintiff. (Id.) Because Dr. Leuzinger's opinion placed "excessive" emphasis on the plaintiff's subjective complaints, and because the record contains conflicting opinions and calls into question the plaintiff's credibility, I find that the ALJ's decision to give reduced weight to Dr. Leutzinger's report was proper.

> Citing Langley v. Barnhart, 373 F.3d 1116, 1121 (10th Cir. 2004), and other cases, the plaintiff argues that the ALJ's decision to discount Dr. Wang's and Dr. Leutzinger's opinions was improper because the ALJ could only speculate that their opinions were based on the plaintiff's subjective complaints. (See Pl.'s Br., filing 25, at 22-23 (citing, inter alia, Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000); Sorn v. Barnhart, 178 F. App'x 680, 682 (9th Cir. 2006).) Each of the cases cited by the plaintiff involves an improper rejection of a treating physician's opinion due to the ALJ's own speculation, lay opinion, or judgments about the claimant's credibility. See Langley, 373 F.3d at 1121; Morales, 225 F.3d at 318; Sorn, 178 F. App'x at 682. Although the opinions of treating physicians are generally owed deference, the opinions of consulting physicians such as Drs. Wang and Leutzinger may be weighed using different principles. See, e.g., Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007). Specifically, the opinions of consulting physicians "deserve[] no special weight," and, as I noted above, an

---

[13]I note parenthetically that the ALJ found that the plaintiff's "statements concerning the intensity, persistence, and limiting effects" of her symptoms were not credible in light of her "lack of compliance," "lack of treatment," and her self-reported daily activities. (See Tr. at 26.)

ALJ may give a consulting physician's opinions less weight if they are based largely on subjective complaints rather than on objective medical evidence.  See id.  Moreover, the ALJ's determination that Drs. Wang and Leutzinger over-emphasized the plaintiff's subjective complaints and de-emphasized the results of their own examinations is not speculative; rather, it is supported by specific references to evidence in the record.  In short, the cases cited by the plaintiff are distinguishable from the case before me.

The plaintiff also argues that the ALJ erred by giving "little weight" to the opinions expressed in the "Initial Psychiatric Assessment" that was made at the Western Montana Mental Health Center.  (See Pl.'s Br., filing 25, at 19.)  I agree.  In discounting this assessment, the ALJ stated, "[D]uring the exam, the claimant denied any alcohol use except for an occasional drink. There is no reason to suggest that the claimant's lack of veracity regarding her history of drinking would not extend to her other complaints and, as such, the undersigned gives little weight to the opinions expressed in this Assessment."  (Tr. at 24.)  It is true that the plaintiff's denial of "any alcohol usage except for an occasional drink" is contradicted by the record–at least through early 2005.  (Id. at 746.  See also id. at 22 (stating that the plaintiff's "substance use" went "into remission as of April 2005).)  However, the ALJ decided to afford little weight to the entire assessment based solely on speculation that the plaintiff's "lack of veracity regarding her history of drinking . . . extend[s] to her other complaints," (id. at 24), and it seems to me that such speculation is improper.  Furthermore, in contrast to the reports of Drs. Wang and Leutzinger, the assessment performed at the Western Montana Mental Health Center does not appear to have been prepared by a consulting physician.  On remand, the Commissioner must re-weigh this assessment in accordance with the applicable regulations and other established principles.  See, e.g., Wagner v. Astrue, 499 F.3d 842, 848-49 (8th Cir. 2007) (summarizing the process for weighing medical opinions).

22

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated June 11, 2009.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge